Good morning, Your Honors. I'm Judith Wood for the petitioner. Yeah. Don't we have any more light here? Let's see. East West Martinez? More light, you know. All the lights are off. No, they're not. They're off in the back of the courtroom. Yeah, they're off. We've got to raise them, yeah. Yeah. Oh, okay. Yeah, all right. We'll issue flashlights. Can you see all right? I can see. Okay. Can you see me? Yeah, yeah. I think so, yeah. I got you. This case involves several issues, Your Honor. It actually mirrors a very famous case, which I'm sure you're all aware of, which is the matter of R.A., which is currently still held in abeyance, which is why there's been some procedural confusion in this case as well. The Attorney General requested that in the R.A. case, both sides, the petitioner and the Respondent, file briefs regarding their opinion about whether R.A. met the qualifications for belonging to a social group. And in the Department of Homeland Security brief, which was filed on February 14th, 2004, the Department of Homeland Security defines the social group, redefines it as, quote, a woman in Guatemala who is unable to leave the relationship. That's R.A. And married woman in Guatemala who is unable to leave the relationship. You know, can I short-circuit this a little bit? I'm familiar with the progress of the opinion coming out in R.A., the Attorney General asking for withdrawal and reconsideration, and then nothing more coming out of the AG's office. So I know this. But I'm focusing on the difficulties of this case in relation not only to a matter of R.A., but more broadly. I mean, we've got two petitions here. One of them is from the March 2002 BIA Affirmative of the Denial of Application for Cancellation of Removal. And the other one is a petition for review of the BIA's denial of motion to reconsider in July 2004. Now, your focus in the briefs, I think, has not been on the March 2002 order because there had been a waiver. They conceded the removability, and then they had trouble proving it. And the question of cancellation or removal and qualification, we really don't have any jurisdiction over. So the focus is on the petition for review of the 2004 order. Is that right? Well, they kind of bleed together, Your Honor. And the reason why is because — How do we have any jurisdiction over the 2002 order when the only question in that order, the only question decided by the BIA was that they were not entitled to cancellation or removal because of insufficient hardship? Well, in the 2002 order, we believe that the legal definition of severely unusual — extreme and unusual and — extremely unusual and severe hardship was not properly adjudicated by the immigration judge. The immigration judge — I see that you're saying the wrong legal standard was applied. Right. The immigration judge originally, in the first instance, regarded the hardship to have to be an unconscionable harm. But later on, the BIA redefined the level of hardship to be less than unconscionable in various cases like Montreal. And if you put together the facts of this case where the woman might actually be killed by her prior husband if she was sent back to El Salvador, at least she would suffer severe harm, as she already has. That would up the level of hardship to the children as well, if you take the two cases as a whole, if you look at it in a holistic way, if you will. So the easiest way to hold in your favor in this case would simply be to go back to grant and remand of the BIA on what constitutes sufficient hardship? Well — Say under the proper standard, because obviously we can't get into their factual determination as to what hardship is or isn't. Right. You can't. And so — Is that going to do — There is a legal issue in the parameters of what constitutes a hardship. But will that in fact do you any good? Because hardship really is, as it's currently defined — I mean, we don't have any jurisdiction to decide it, but I think it's a loser. You don't have jurisdiction for discretionary, but the legal — the way the immigration judge — No, I understand that. I've got a different question. If we send it back to the BIA for a redetermination under the proper legal standard, whether they're entitled to cancellation or removal, as a practical matter, I don't see the facts that's going to get them that. Well, of course, if it's remanded to the BIA, they'll remand it to the immigration judge for a hearing on asylum. Because — Well, why would they do that? Because in that first one, they conceded removability. So that question's gone from that case. The only way you can get back at that question is under ineffective assistance of counsel. Conceded removability doesn't cause a person to give up their asylum case. It's a responding conceded removability. Did they waive their asylum claim in front of the IJ? She can still go forward with asylum before the IJ. I asked the question. She never did. She did not waive the asylum claim in front of the IJ? She didn't waive it. She simply said it's — things are rough in El Salvador. No one ever questioned her about what actually — that's the whole problem with this case. This woman was severely tortured and threatened by the prior — Her lawyer withdrew — her lawyer withdrew the application for asylum. Isn't that what happened? When was that, August? The prior — right. That's the — unfortunately, that's the practice in Los Angeles insofar as if the — if you want to go forward with a cancellation case, you actually — you're right, has to withdraw the — usually has to withdraw the asylum case. That was — I didn't ask her properly, but that was my question. So how does she have a live asylum claim if we remand in the 2002 order? Well, she can withdraw the — the withdrawal of the original asylum claim, which was taken, what, in 1997, years before R.A. was heard. And I think the original hearing was in 1997 before — with prior counsel. And no one ever — the crux of this matter is that no one ever talked to this woman. No one ever asked her what happened. Well, I understand that. And you got, it seems to me, a fairly good ineffective assistance of counsel claim. The trouble with that one is that's not raised until — until the second petition. And that one was pretty darn late. That is to say, your office was representing her at the time she files the motion to reopen, which is denied and not appealed from. Then you make the second motion to — to reconsider quite some time after that. And I think you need sort of a recent discovery of ineffective assistance of counsel in order to excuse the other — what would otherwise be the untimeliness. How do I get past that one? I have to say, I'm sympathetic with your client, and I'm trying to figure out how to get there. I realize that, Your Honor. The reason for the motion to reconsider filed when it was, we filed it after the Department of Homeland Security came out with their brief, which defined the social group and found that actually R.A. should get asylum. It didn't find, made their opinion, that R.A., which this case is very similar to, should get asylum, that she is eligible for asylum, but redefined the social group. Where in the record do you say to the BIA that that's your reason why you should be excused from late filing, that is to say, the filing of that brief by the Homeland Security? Well, we go through a whole discussion of the vicissitudes of what happened with the R.A. I'll ask you a very precise question, and I'll ask it now a slightly different way. When you filed the motion to reconsider in front of the BIA — now, this is the second basic motion to reconsider in front of the BIA — did you at that time say, here's why we are doing this late and here's why we should be excused from what would we are keying off of the filing of the Homeland Security brief, because once that's filed, we've got new laws? Where did you say that? Did you say that? I'm pretty sure we mentioned it. Where? I'll have to look. I really don't have it at my fingertips, Your Honor. Well, because I read that last — I read your papers last night, and I don't recall having seen it. I'd have to — I'd be fumbling through these papers to get it to me. Okay. There's another issue in this case. Well, you had — you talked about facts that were previously unavailable, the molestation by the grandfather. Was that on the basis of — Well, the facts were available. Let's see. I think your second motion to reopen was in July of 2004. Right. And that motion to reopen came after the DHS issued their brief. But the facts, her underlying facts were available. We've made an argument that she, in fact, suffered from severe post-traumatic stress syndrome and never was able to confide in anyone what had happened to her in El Salvador at the hands of her prior husband. And until many years after the case was concluded, when I met her and I actually sort of saw on her face, in a way — it's hard to explain that in legalese, but I just saw her suffering and I asked her what happened, and she sort of whispered to me in my office that her husband had killed his prior wife and threatened to kill her and all these horrific And she couldn't really escape from him, even though she tried to. So it's so similar to R.A. And as R.A. evolved, we thought, well, maybe we'll get an audience with this Court now that the Department of Homeland Security has found that R.A., in fact, was eligible. There was all this discussion and kind of the case was held in abeyance as to whether or not R.A. fell into a protected social group. And when — the case still isn't decided, but if R.A. falls into a social group, there remains an issue for this Court. Let's say the Court decides that R.A. gets asylum. I still have an issue with this case. I understand. I mean, I'm quite familiar with the sort of the justice of her claim, or maybe I'll say the injustice of the things that have been done to her and the things that she's worried about. But I'm concerned procedurally as to how I get there. And I — this second motion, the 2004 motion, was filed late. And I — and what's the — what rationale do you have that will help us say it doesn't matter that it was filed late? Well, the promulgation — everything was held in abeyance. And then the Department of Homeland Security issued their brief, which set out the fact that they thought R.A. should get asylum. So if R.A. should get asylum, there's a good case for East West Martinez getting asylum. Who held it in abeyance? What? Who held this case in abeyance? The attorney — not this case, R.A. Oh, I thought you said this case. No, no, no. This case mirrors R.A. So we've kind of tracked R.A. and been working on this case. Let's say that's a given. That R.A. should get asylum. There's still an issue in this case, and that's an issue that I want you to consider. In the DHS brief, they say that the social group is defined as a married woman in Guatemala who cannot escape the relationship. So I'd like this point — You'll have to remind me in R.A., because I'm not familiar with R.A. Is the married woman married to somebody in Guatemala? Right. Because East West Martinez is not married. Exactly. This was a common-law marriage in El Salvador, and she's currently married to Mr. Yes, and that's the issue that I'd like to raise. Is it only a married woman in either Guatemala or El Salvador? So you're not on all fours with R.A. Oh, there's a difference. You're going to be an extension of R.A. Yes, and that's what I want to express to you. It was a common-law marriage. She lived in a marital relationship with the prior husband, had a son with him. And so should the parameters of R.A., if the case is remanded, be extended to women who live within a marital relationship, although it's not actually a legal marriage? Because in various countries in Central America, especially I know from — We know all that. All right. But as Judge Fletcher said, how do we get there? How do we get there procedurally? Well, I think the DHS regulations give you the opportunity, although they haven't been at least a woman in R.A.'s position should be granted asylum. Just by fact that the DHS wrote that brief and that regulations are being promulgated and that she never had an opportunity to actually tell the — she never had a hearing. We've had a number of cases where, you know, we've declared a class of people, you know, it can be a family, where you've got an abusive father, or it can be a Russian new entrepreneur. You know, we've got a number of those. But how do we get there procedurally? That's what Judge Fletcher wants to know. He teaches civil procedure. He wants to know how you get there procedurally. Well, I think that — If we didn't have all those stumbling blocks, you wouldn't have a problem. So you have to tell us, how do we get there? Well, the problem is that the government — we were waiting for the government to issue new law, because that would give us a real grounds for a motion to reopen, a motion to reconsider. We're waiting for these regulations. The regulations haven't been moved. Well, how long were you entitled to wait? Well, the — You waited two years. That's out of the period that's specified by the regulations. Was BIA required to — not to send your people out of the country until they had decided R.A.? And then you had an opportunity to come in and argue that this is an extension of R.A.? Well, we have argued that it's an extension of R.A. Well, I understand that that's what you're arguing. But you're telling me that you had to wait for R.A. to come down. But you're an extension of R.A. This is not R.A. Right. So you're an aggressive extension of a decision that was pending that may or may not come out in favor of your client. Exactly. In the meantime, you sit on your rights. You delayed more than two years, well outside of BIA's regs. And now the question is, well, how can we continue to review this? How long can we keep this record open? Well, with many cases, the whole class of NACARA applicants, their cases were reopened due to a class definition. People from El Salvador and Guatemala, their cases were reopened many years after their cases were originally heard. And we think that this is a similar situation. But they were part of an ongoing, you know, big, huge class action, right? But this is what — Isn't that right? Well, that's why I think the reason why I think the Attorney General is — They were part of an ongoing lawsuit. This will be, too, though. I mean, if — Part of the challenge here is that you've had an opportunity to reopen or make a motion to reopen or to reconsider before the BIA, to urge them in the first instance, that is, to be the RA. That is, you could have made Islas Martinez the lead case before the BIA on this question. And since it's not on all fours with RA, there was no reason that you had to wait. But you've sat on your rights now, and now it's very difficult to come forward and say, well, now we should have a second opportunity here, even though we sat on our hands for two years. Well, we did file a motion to reopen. And there was a Ninth Circuit case filed. This is a second motion to reopen and then a motion to reconsider based on new law. The DHS — it's not actually law, I mean, because it's only a brief. But it's determinative of what will be the law, I believe. Okay. Thank you. Thank you. Good morning. May it please the Court, my name is Cindy Farrier, and I'll be representing the Attorney General in this matter. I think the Court has recognized the procedural problems with the case, and that is, in fact, what the government's position is, is that there are procedural problems which prevent the Court from being able to do anything for a petitioner in this particular case. The petitions for review filed in this case are from the dismissal of the denial of the cancellation of removal application. So the government wants to kick these two people out, huh? They want to send Ms. Menjivar back to El Salvador with all the things that have happened. And, you know, the daughter who was abused by her grandfather, seeing a psychologist who was born here, what are we going to do with her? That information which was raised for the first time in the last motion to reopen, reconsider,  in that particular motion they asserted ineffective assistance, and then at the end they mentioned in one paragraph that the petitioner's daughter had been subject to molestation by the grandfather. That was the only paragraph. There was no further information about that. There was a supplemental declaration. Who was representing the family at that time? Present counsel. But just to make clear, the supplemental declaration which actually details that particular abuse, the molestation, wasn't actually before the Board by the time it made its decision. The Board made its decision on that second motion to reopen on July 29, 2004. The supplemental declaration was sent to the Board on the very same day. So the Board didn't actually have that detailed information regarding the molestation until after it had rendered its decision. Assume for a moment, and I'm not challenging the factual procedural narrative you just provided, but assume for a moment that the Board had before it as it was making its decision, not only the papers it did have, but also that one-page declaration of the mother. Would that have been a proper basis for the motion to reopen, including excusing the timeliness because these are new facts? That would have been a basis to reopen, to go all the way back to reopen the cancellation of removal case. It would not have been a basis to raise the asylum application and the asylum claim based upon the domestic abuse. But those new facts would relate to the underlying cancellation case. So that would be enough to provide reopening for the cancellation of removal? Assuming that the Board found that, indeed, those are facts that are supported and justify reopening. But if they did agree with that, then that would be a basis. The mother's declaration is pretty detailed. Sometimes you read a declaration and you kind of scratch your head and say, boy, this doesn't sound right. Her declaration at AR06, I mean, I'm only prepared to believe that. It doesn't, they still haven't attached any sort of documentation regarding the actual treatment that she's receiving, whether the treatment is ongoing at this point in time. That was filed in 2004. But assuming that they had information such as that and that there is treatment like that that is, in fact, going on, then that might be a basis to reopen. But, again, Petitioners haven't asserted that before the Board. And they didn't file any sort of motion to reconsider, the motion to reconsider. So I'm not sure if they just weren't aware of it. A lot of all these problems arise because the BIA tolerates these notarios and the string of lawyers that they hire. Many of them have been disbarred. And the government knows that's going on. And it goes on and on. You've got poor people. They're in a strange new country. They don't really understand the language. They go and take them in a room and somebody starts filling out a few things and not paying too much attention to them. But, you know, the government knows that goes on. So the government's hands aren't clean as far as I'm concerned. I mean, they need to clean that situation up over there and provide counsel for these people and not accept disbarred lawyers as adequate counsel. And the slogan, a disbarred lawyer is better than no lawyer. I mean, I've heard them tell me that. We're all guilty of this, every one of us. In this particular case, the counsel who was disbarred, Walter Burrier, who they assert all the claims about ineffective assistance against. What is a farrier if someone puts horseshoes on? What's a burrier? He's a guy that comes in and roughs it up first? Sure. I don't have to check that out. I don't know. But Mr. Burrier, in fact, was not the counsel that represented them before the immigration judge. He did appear with them at the master calendar hearing, and simply he did a plea to the notice to appear and withdrew their asylum application. But he did not. How much time did he spend with them? I'm not. It looks as though he appeared with them on their August 1997 hearing and their September 1997 hearing. But in November, by November, they had new counsel, Linda Howard, who, in fact, they haven't asserted any ineffective assistance counsel against. Was she tied up with the Notorios? There's no indication that she's associated with them, and petitioners haven't asserted that in any of their filings to the court. She had separate addresses and doesn't seem to indicate that she was affiliated with Burrier. But nonetheless, the hearing before the immigration judge regarding the cancellation of removal application was by her. And with regard to the facts that petitioner is now asserting the unconscionable standard that the IJA applied the wrong standard in evaluating their hardship, that is something that they did not allege in their motion to reopen the second one. Because they've got incompetent lawyers. By this time it was present counsel. This body of law is, as far as I'm concerned, twice as complicated as the Internal Revenue Code, plus throw in the sentencing guidelines. And you've got Notorios advising these people and disbarred lawyers advising them. I mean, it's just a disgrace. It really is. Just to make clear, here the petitioners had present counsel at the time they filed their second or their first motion to reopen asserting asylum on domestic violence. They didn't file the petition for review from that particular decision. Then they waited a year and a half before they filed the second motion.  Let me ask you this. I think Ms. Wood is right to say that we do have jurisdiction on a direct petition for review of BIA decision denying cancellation of removal where it is apparent that the wrong standard was used. We don't have jurisdiction. Assuming they recite the right standard and they just evaluate the facts in this way that I might personally agree or disagree, I've got nothing to say about that. And I do recognize that the IJ was in a bit of a fix because at that early stage, the law hadn't quite settled out as to what this level of hardship meant, and the IJ did use the word unconscionable, which is not quite the standard. What if we were to remand to the BIA for application of a proper standard? Would that be a wrong thing to do in this case? I believe that it would be because the Board issued its decision after it had developed its case law on the matter of Montreal and these other cases. And it mentions the matter of Montreal, and it has reevaluated the hardship and has determined that the immigration judge's hardship determination was appropriate in light of its intervening case law. So the only basis on which we can remand for redetermination of hardship would be the new facts? I believe so. But, again, those aren't they haven't been reasserted by Petitioner before the Board. They weren't all properly before the Board at the time. Well, they were reasserted before the Board in this last motion to reopen, although you're absolutely right to say it's pretty brief. It was at the very end. They just say, subjected to, oh, I've just read it. 2004, respondent's daughter was sexually abused and is now under psychiatric care. These facts were unavailable. It doesn't even say by whom and so on. And this declaration that shows up, you're absolutely right, is sent in on the 29th, which is precisely the same date and so on. What's your sense as to what might happen as a practical matter if the BIA or, back to the IJ, were to have this sexual molestation documented as we now have it, perhaps even with some testimony on remand? Is there a shot at cancellation or removal based on hardship based on this? I don't believe that it's appropriate for me to make the determination, but certainly hardship relating to the children is what is critical in a cancellation case. It's hardship to the citizen. That's correct. And the child is a citizen. But, again, we need to be clear that these people are, in fact, that she is, in fact, still in counseling. Just more documentation regarding the molestation. And then what are the alternatives? I mean, obviously, if they were to take the child back to Central America, well, she's away from the grandfather. On the other hand, we're back into, you know, there's apparently some bad uncle down there who raped children, too. Again, that would be something for the Board to evaluate in determining whether reopening is better. Would you object to sending them back for reopening just on the question of hardship based on these facts? Well, I object in the sense that this case has been mishandled procedurally. Yes, it has been. I think we're all on the same page with that. Certainly, if Petitioner had additional information that she wished to provide, I guess my position would be if she has additional information regarding the child that she needs to provide, then the appropriate thing would be, again, to file another motion with the Board to let them consider it. It's all right to be kind, even though you're with the Department of Justice. I know you're struggling. Anyway, unless the Court has any further questions for me. Well, I do have another question. I think you probably are not in a position to answer it, and I don't want to put you in a position where you have to go beyond your authority. But the Board reacts very differently to motions that are joint motions to reopen. Would the government consider a joint motion to reopen on the question of not asylum, but rather on the question of hardship? The government always is amenable to considering joint motions to reopen. That is something that the Department of Homeland Security, the local office, I have heard, is quite backed up in requests such as that. But certainly if Petitioner's Council chose to do something like that, we would be willing to, if the Court wished to hold it in advance, this particular decision in advance, while the Department considered that particular joint motion, we would be willing to do that. Okay. Thank you very much. Sure. Well, you know, I think we're getting there, all right? As far as holding on to this evidence, we learned about it. The minute we learned about the child's abuse, we got the declaration from the mother and FedExed it to the Board, and we just acted as quickly as we could. There's a lot of shame involved in this case. When people suffer abuse, when people suffer domestic violence, when children suffer, it actually wasn't only sexual abuse, it was incest. There's a lot of shame, and people are not necessarily quickly forthcoming with that information. As soon as we obtained it on all levels, we let the various parties know. So we would be amenable to doing another motion to reopen. Of course. We'd do anything, actually, to help this woman. Okay. Thanks. All right. Matters submitted.
judges: Pregerson, W. Fletcher, Bybee